**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:24-CR-122-RDP-NAD-1** |
| | } | |
| **CARLTON LENARD ADAMS,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on the government's Motion to Exclude Testimony of Dr. Kenyon Conklin ("Dr. Conklin"). (Doc. # 86). In the Motion, the government seeks to exclude the witness based on her purported lack of qualifications, unreliable methods used to attack the government's expert, and the unhelpful, irrelevant, and misleading nature of her testimony. Defendant Carlton Adams ("Defendant"), however, contends that Dr. Conklin's testimony is necessary to give the jury a full understanding of all potential causes of the injuries alleged in the indictment. After careful consideration of the parties' briefs and applicable law, the court concludes that the government's motion is due to be denied.

## I.     Background

### A.  Procedural and Factual Background

On March 28, 2024, Defendant was indicted by a grand jury on fifteen (15) counts of knowingly possessing a dog for the purpose of having the dog participate in an animal fighting venture under 7 U.S.C. § 2156(b), and two (2) counts of felon in possession of a firearm under 18 U.S.C. § 922(g)(1). The expert testimony at issue concerns the dog fighting charges.

On May 6, 2024, the government produced the Rule 16(a)(1)(G) disclosure and associated report of its proposed expert witness, Officer Amy Taylor ("Officer Taylor"). Officer Taylor is the animal fighting and animal cruelty investigator for the Office of the Attorney General of the Commonwealth of Virginia. (Doc. # 86 at 3). According to the Motion, Officer Taylor will testify that the items seized from Defendant during the government's investigation, the scars and injuries seen on some of the dogs, and the conditions in which the dogs were maintained are all consistent with use in organized dog fighting. (*Id.* at 3-4). The government contends that Officer Taylor's conclusions are based on her "personal observations, training, and experience." (*Id.* at 3).

On June 3, 2025, Defendant produced the Rule 16(a)(1)(G) disclosure and associated report of his proposed expert, Dr. Conklin. Dr. Conklin is a licensed veterinarian and "Veterinary Medical Expert" for Robson Forensic, Inc. (Docs. # 87 at 10 ¶ 4; 86-1 at 15). Dr. Conklin's CV shows that she has been a licensed veterinarian for over twenty years in various clinical settings, including commercial veterinary clinics and the U.S. Army. (Doc. # 86-1 at 16-17). In her affidavit, she states that she has experience diagnosing and treating various forms of trauma, from simple interdog aggression to organized dog fighting. (Doc. # 87 at 12 ¶ 18). She lists her areas of expertise as internal medicine, surgery, anesthesia and pain management, behavior and training, equine, abuse and neglect, safety issues, facility design and animal confinement, professional communications, research considerations, and zoonotic disease and public health. (*Id.* at 15-16).

Dr. Conklin's expert report primarily focuses on alternative diagnoses that she claims were not adequately considered in Officer Taylor's report. For instance, she states in her report, "[b]y not considering alternative explanations for the conditions of Mr. Adams' dogs documented in the case material, Ms. Taylor fail[ed] to properly use the scientific method of objectively establishing facts through testing and experimentation." (Doc. # 86-1 at 11). Dr. Conklin does not, however,

conclude that the injuries to the dogs were not a result of dog fighting. She instead concludes that "it is unreasonable to exclude etiologies other than dog fighting to explain the documented conditions in the dogs at the time of their seizure from Carlton Adams' properties." (*Id.* at 13).

The government argues that Dr. Conklin's testimony should be excluded for three reasons. First, it asserts that Dr. Conklin is not qualified to give expert testimony in this case because she does not have experience with dog fighting. (Doc. # 86 at 7-10). Second, the government contends that Dr. Conklin has used an unreliable method to attack Officer Taylor for not ruling out other possible etiologies. (*Id.* at 11). Third, the government claims that the diagnostic chart found in Dr. Conklin's report is irrelevant and misleading. (*Id.* at 15-17).

## II.    Legal Standard

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993) and its progeny, Rule 702 requires district courts to perform a critical "gatekeeping" function concerning the admissibility of scientific and technical expert testimony. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). To perform their role as gatekeeper, courts "engage in a rigorous three-part inquiry." *Id.* District courts must consider whether: "(1) the expert is qualified to testify competently regarding the matters [s]he intends to address; (2) the methodology

by which the expert reaches h[er] conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id.* (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). Though there is some overlap among them, these three basic requirements – qualification, reliability, and helpfulness – are distinct concepts that a district court must be careful not to conflate. *Id.*; *see also* Fed. R. Evid. 403.

The proponent of expert testimony always bears the burden to show that the requirements of qualification, reliability, and helpfulness are met. *Id.* In a criminal case, that remains true whether the proponent is the government or the accused. *Id.* And, in addition to Rule 702, Rule 403 also applies to expert testimony. *Id*. at 1263.  Thus, expert testimony that is otherwise admissible under Rule 702 and *Daubert* may still be excluded under Rule 403 if the probative value of the testimony "is substantially outweighed by its potential to confuse or mislead the jury." *Id.* Before assessing the parties' arguments, the court briefly reviews the three basic requirements.

### A.  Expert Qualifications

Experts may be qualified to testify in various ways, including training, education, or experience in a given field. *Id.* at 1260-61. Often what is at issue under the qualification prong is not whether the proffered expert is qualified in the abstract, but whether her training, education, or experience qualify her to render an opinion on a specific topic. Particularly where an expert's qualifications rest on her experience (as opposed to scientific or technical training), the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* at 1261. It is not enough for the court to simply take the expert's word for it. *Id.*

### B.  Reliability of the Expert's Opinion

Before admitting expert testimony, trial judges must determine that the testimony is (1) based on reliable facts or data; (2) the product of reliable principles and methods; and (3) based on a reliable application of those principles and methods to the facts of the case. Fed. R. Evid. 702. When evaluating scientific expert opinions, courts consider the following factors in making those determinations: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Frazier*, 387 F.3d at 1262.

Those same criteria may be used to evaluate the reliability of "non-scientific, experience-based testimony." *Id.* But importantly, "[t]hese factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." *Id.* Sometimes these factors "will aid in determining reliability; sometimes other questions may be more useful." *Id.* The bottom line is that trial judges have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* "Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." *Id.*

### C.  Helpfulness to the Trier of Fact

Finally, expert testimony under Rule 702 must assist the trier of fact. Expert testimony is helpful to the trier of fact if it "concerns matters that are beyond the understanding of the average lay person." *Id.* Expert opinion "generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262-63. Additionally,

expert testimony is only helpful to the trier of fact if there is "an appropriate 'fit' with respect to the offered opinion and the facts of the case." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004). In other words, "expert testimony must be relevant to the task at hand[;]" it must "logically advance[ ] a material aspect of the case." *Id.* at 1298-99 (internal quotation marks omitted). There is no "fit" when, for example, "a large analytical leap must be made between the facts and the opinion." *Id.* at 1299.

## III.    Analysis

As part of its gatekeeping role, the district court must determine whether Dr. Conklin is qualified (*i.e.*, will her knowledge, skill, experience, training, or education help the trier of fact to understand the evidence or determine a fact at issue), whether her opinions are reliable (*i.e.*, has she used a proper methodology in reaching her opinions), and whether her testimony is helpful (*i.e.*, does her proposed testimony "concern[] matters beyond the understanding of the average lay person."). *Frazier*, 387 F.3d at 1260-61.

Veterinary diagnoses are generally beyond the understanding of the average lay person. So, to the extent relevant to the issues in the case, if otherwise admissible, the proffered opinions will likely help the trier of fact. The dispositive questions here concern Dr. Conklin's qualifications, the reliability of her opinions, and the probative value of her testimony weighed against its potential to confuse or mislead the jury.

### A.  Dr. Conklin's Qualifications to Testify

The government's primary argument regarding Dr. Conklin's qualifications is that she does not have adequate experience with dog fighting to serve as an expert in this case. (Doc. # 86 at 7-10). The government contends that Dr. Conklin's experience as a litigation consultant and a clinical veterinarian in various settings does not qualify her to serve as an expert witness in a dog

fighting case. (*Id.*). Defendant's response is straightforward. He argues that Dr. Conklin does have experience with dog fighting; in any event, notwithstanding that experience, Defendant is not required to produce a specific "dog fighting" expert in response to the government's expert. (Doc. # 87 at 12 ¶ 18, 6 ¶ 25). Defendant argues that Dr. Conklin's years of experience as a licensed veterinarian, her training, and her past treatment of pit bull-type dogs qualifies her to serve as an expert witness in this case. (Doc. # 87 at 3-4 ¶¶ 15, 17, 20). In her affidavit, Dr. Conklin states that she has "extensive experience in the diagnosis and treatment of numerous etiologies of canine trauma," including "canine bites from simple interdog aggression to organized dog fighting." (Doc. # 87 at 12 ¶ 18).

As stated, Dr. Conklin's CV indicates that she has been a licensed veterinarian for over twenty years, serving in various clinical settings, including commercial veterinary clinics and the U.S. Army. (Doc. # 86-1 at 16-17). She has most recently served as a professional litigation expert. (Doc. # 86-1 at 15). She lists her areas of expertise as internal medicine, surgery, anesthesia and pain management, behavior and training, equine, abuse and neglect, safety issues, facility design and animal confinement, professional communications, research considerations, and zoonotic disease and public health. (*Id.* at 15-16). The government argues that Dr. Conklin primarily worked at retail veterinary clinics, where people engaged in dog fighting activities do not bring their dogs. (Doc. # 89 at 2). The government also contends that while there is training available to veterinary practitioners and law enforcement regarding dog fighting, Dr. Conklin has seemingly not participated in any of these trainings. (*Id.* at 3).

Under *Frazier* and Rule 702, an expert may be qualified in a variety of ways, including "knowledge, skill, experience, training, or education." 387 F.3d at 1261; *see also* Fed. R. Evid. 702. When an expert's qualifications rely solely on her experience, the expert "must explain how

that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id*. It is not enough for the court to simply take the expert's word for it. *Id.* To meet the qualification prong, an expert must be "qualified to testify competently regarding the matters [s]he intends to address." *City of Tuscaloosa*, 158 F.3d at 562. Stated differently, "[s]o long as the witness is minimally qualified, objections to 'the level of the expert's expertise [go] to credibility and weight, not admissibility." *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 585 (N.D. Fla. 2009) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997)), *aff'd*, 609 F.3d 1183 (11th Cir. 2010).

Here, Dr. Conklin does not hold herself out as a dog fighting expert nor does she specifically opine on whether dog fighting took place. Instead, she would testify about potential alternative diagnoses that she believes were not adequately considered by the government's expert. This opinion is based on her experience and expertise as a licensed veterinarian in clinical settings. As such, she is qualified on the subject she wishes to address – veterinary diagnoses. *See City of Tuscaloosa*, 158 F.3d at 562. The government's arguments about Dr. Conklin's relative lack of experience with organized dog fighting do not undermine her qualifications to testify about alternative diagnoses. At best, they go to the credibility and weight of her testimony. These are questions for the jury. *Id.* However, her extensive experience as a clinical veterinarian qualifies her to opine on the consideration of diagnostic alternatives, which is what her testimony is limited to.

### B. The Reliability of Dr. Conklin's Proffered Testimony

The government next argues that Dr. Conklin uses an unreliable method to attack Officer Taylor's proffered opinion. Dr. Conklin claims Officer Taylor has not ruled out other possible etiologies. (Doc. # 86 at 11). The government presents two primary arguments: (1) that Dr. Conklin

used an unreliable method by attacking Officer Taylor for failing to use the scientific method when Officer Taylor did not claim to do so and (2) that Dr. Conklin's use of the differential diagnostic chart was unreliable because it precluded the possibility of a dog fighting diagnosis.

Defendant argues that (1) Dr. Conklin's testimony does not fault Officer Taylor for not applying the scientific method but instead presents alternative medical explanations for the dogs' injuries, and (2) that differential diagnosis is a standard methodology used to determine possible causes of medical conditions. (Doc. # 87 at 5 ¶ 22, 6 ¶ 27).

Dr. Conklin's report begins by listing frequent medical conditions exhibited in pit-bull style dogs, including allergies, parasites, and skin issues. (Doc. # 86-1 at 3-4). The report also explains that it is difficult, when determining injury causation and timeframe, to determine the exact age of a wound after the initial phases of healing. (*Id.* at 4). Dr. Conklin includes a chart containing the Dog ID, the findings of the intake physical exam completed by Dr. Emily Falk, DVM, objective laboratory findings, and a description of conditions observed in photographs provided in the case documents. (*Id.* at 5-8). Next, the report includes a table containing her analysis of pertinent findings and associated differential diagnoses for each dog that she says may explain the relevant findings. (*Id.* at 9-11). Dr. Conklin critiques Officer Taylor's investigation for failing to consider alternative hypotheses beyond dog fighting. (*Id.* at 11-12). Dr. Conklin states that had skin diagnostics, radiographs, and accurate and thorough photographs been initially collected by Dr. Valk, the investigation's reliability would have been increased and the differential diagnoses would have been narrowed. (*Id.* at 12). Dr. Conklin concludes by stating that "it is unreasonable to exclude etiologies other than dog fighting to explain the documented conditions in the dogs at the time of their seizure from Carlton Adams' properties." (*Id.* at 13).

The government argues that the methodologies contained in this report are unreliable because they generate results that are inconclusive and incapable of resulting in a diagnosis of "dog fighting." (Doc. # 89 at 5, 7). Defendant argues that the methodologies used by Dr. Conklin are sound, even if they do not result in a definitive diagnosis. (Doc. # 87 at 6 ¶ 27).

"The court has considerable leeway in determining what is reliable, as long as it its determination is done in light of the *Daubert* factors." *United States v. Watkins*, 880 F.3d 1221, 1227 (11th Cir. 2018) (citing *Frazier*, 387 F.3d at 1262). "Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." *Frazier*, 387 F.3d at 1262. To aid in determining reliability under Rule 702, courts look to certain non-exclusive factors set forth by the Court in *Daubert.* The Eleventh Circuit has said that those factors include:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community.

*United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013) (citing *Daubert*, 509 U.S. at 593-94). *See also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999) ("[*Daubert's*] list of factors was meant to be helpful, not definitive.").

The court concludes that the government's objections to Dr. Conklin's testimony go to the weight of her opinions, not their admissibility, and that the government may address any purported objectionable opinions through "[v]igorous cross-examination" and the "presentation of contrary evidence." *Daubert*, 509 U.S. at 596.

The government's objection regarding Dr. Conklin's critique of Officer Taylor for failing to use the scientific method is rooted in a disagreement about results and reasoning. It is not,

however, based on unreliable methodologies undertaken by Dr. Conklin in her own report. Likewise, Dr. Conklin's use of differential diagnosis is methodologically sound because she is applying her expertise in veterinary diagnoses to the facts of the case, even if differential diagnosis is incapable of producing a diagnosis of "dog fighting." Dr. Conklin does not purport to testify as to the exact cause of the dogs' injuries. Rather, she uses her veterinary expertise to evaluate the available evidence regarding the physical condition of each dog to provide a list of possible diagnoses. Notably, one of these diagnoses is trauma, which is consistent with organized dog fighting – a point that can be made to the jury.

### C.  Dr. Conklin's testimony under Rule 403

Even if expert testimony meets admissibility requirements, it may be excluded under Rule 403. Pursuant to Rule 403, relevant evidence may be excluded if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The government argues that Dr. Conklin's testimony could confuse or mislead the jury in two ways: 1) because Officer Taylor never claimed to use the scientific method, Dr. Conklin's proffered testimony creates the appearance of a conflict where there is none; and 2) the diagnostic chart found in Dr. Conklin's report is irrelevant and misleading because it could never include dog fighting as a differential diagnosis. (Doc. # 86 at 12, 15-17).

Defendant argues that Dr. Conklin's testimony does not run the risk of confusing the jury but instead provides "necessary clarity in evaluating the government's conclusions." (Doc. # 87 at 5 ¶ 23). Moreover, Defendant argues that Dr. Conklin's proffered testimony is not misleading because she is not required to assert definitively whether dog fighting occurred in order to provide helpful expert testimony. (*Id.* at 6-7 ¶ 29).

As a threshold matter, Dr. Conklin's testimony is relevant because the introduction of potential alternative diagnoses may tend to contest a material issue in this case: whether dog fighting took place. *See* Fed. R. Evid. 401.

Further, the court concludes that Dr. Conklin's testimony is probative to whether dog fighting took place. The court also concludes that the risk of Dr. Conklin's testimony confusing or misleading the jury is, at best, low. While Dr. Conklin does not plan to definitively testify whether dog fighting took place, she does plan to present several alternative diagnoses and scenarios related to the dogs' conditions. Dr. Conklin has stated that one of these diagnoses is "trauma," which can be consistent with dog fighting activities. (Doc. # 87 at 14 ¶ 23). This testimony is unlikely to confuse the jury, who will weigh the potential alternative diagnoses presented by Dr. Conklin against the government's evidence supporting a finding of dog fighting activity.

Likewise, Dr. Conklin's critiques of Officer Taylor for failing to use the scientific method do not run the risk of confusing or misleading the jury. The parties do not dispute that Officer Taylor did not use (nor has she claimed she used) the scientific method in generating her report. However, the government argues that Dr. Conklin's testimony criticizing Officer Taylor's report for its lack of scientific foundation creates the appearance of a conflict surrounding the requirements of expert testimony where there is none. The court disagrees.

Dr. Conklin's testimony critiques how Officer Taylor conducted her investigation but falls short of stating that use of the scientific method is required for expert testimony. Dr. Conklin does not state – and this court does not rule – that use of the scientific method is required to meet the standards of Rule 702. The disagreement between the experts goes to methodologies and scope of the investigation, not to the requirements for expert testimony. This dispute goes to the weight

afforded to each expert's testimony – a question that is ultimately decided by the jury after cross-examination and the presentation of contrary evidence. *Daubert*, 509 U.S. at 596.

**IV.     Conclusion**

For the reasons explained above, the government's Motion to Exclude Testimony of Dr. Kenyon Conklin ("Dr. Conklin") (Doc. # 86) is **DENIED**.

**DONE** and **ORDERED** this August 20, 2025.

_____
**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE